____ FILED   ___ ENTERED
____ LOGGED ____ RECEIVED

10:04 am, Oct 20 2021

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___TTS___ Deputy

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF 180 HIGH PARK LANE APARTMENT 1508 SILVER SPRING, MARYLAND 20910 (SUBJECT PREMISES)** | Case No. ____20-mj-3226-CBD____ <br><br> **UNDER SEAL** |
| **IN THE MATTER OF THE SEARCH OF A 2016 BLACK MERCEDES BENZ BEARING MARYLAND REGISTRATION # 1DR4411 AND VIN # 4JGED6EB5GA010465 (SUBJECT VEHICLE)** | Case No. ____20-mj-3227-CBD____ <br><br> **UNDER SEAL** |
| **IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICE ASSIGNED CALL NUMBER (202) 341-4675 WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTIFIER 310410936243056 (TARGET CELLULAR DEVICE)** | Case No. ____20-mj-3228-CBD____ <br><br> **UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF APPLICATIONS
FOR SEARCH AND SEIZURE WARRANTS**

I, Jenna C. Sullivan, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.     This affidavit is being submitted in support of search warrants for the premises known as **180 High Park Lane Apartment 1508, Silver Spring, Maryland 20910** (hereinafter, the "**SUBJECT PREMISES**") further described in Attachment A-1 and a **2016 black Mercedes Benz bearing Maryland registration 1DR4411 and VIN # 4JGED6EB5GA010465** (hereinafter, the "**SUBJECT VEHICLE**") further described in Attachment A-2, for the things described in Attachment B-1.

1

2.     This affidavit is also being submitted in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(202) 341-4675** with International Mobile Subscriber Identifier: **310410936243056** (hereinafter, the "**TARGET CELLULAR DEVICE**") whose provider is AT&T, a wireless telephone service provider headquartered at 11760 US Highway One 6th Floor, North Palm Beach, FL 33408. The **TARGET CELLULAR DEVICE** is described herein and in Attachment A-3, and the location information to be seized is described herein and in Attachment B-2.

3.     As explained herein, based on my training and experience, and the facts set forth in this affidavit, I submit that there is probable cause to believe that Andre HAMILTON (hereinafter, "HAMILTON") is involved the distribution of and a conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. There is also probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as further described in Attachment B-1, will be found in the **SUBJECT PREMISES** and the **SUBJECT VEHICLE** and any electronic devices contained therein.

## AGENT BACKGROUND

4.     I am a Task Force Officer with the Drug Enforcement Administration, and have been since July 2018. I am currently employed with the Loudoun County Virginia Sheriff's Office and have been since 2008. During my time in law enforcement, I have participated in the application for and execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of

numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

5.      As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances.  Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled dangerous substances.

6.      Based upon this experience, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking.  During the course of my participation in investigations of narcotics trafficking organizations, I have testified at trial, in grand jury proceedings, and at probable cause and detention hearings.  I have gained knowledge in the use of various investigative techniques including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

7.      This affidavit contains information necessary to support probable cause.  The information contained in this affidavit is not intended to include each and every fact and matter observed by or known to the United States.  The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by cooperating defendants.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my

review of reports, documents, and other physical evidence obtained during the course of this investigation.

8.      Based on my training and experience, I am aware that:

a.      Narcotics traffickers keep narcotics, narcotics-related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds and storage lockers.  In addition, in a conspiracy involved in the distribution and possession with intent to distribute cocaine base, powder cocaine, heroin, marijuana, or methamphetamine, these locations may also contain apparently innocuous materials that are used for specific purposes in the drug trade.  For example, small and large plastic baggies are the packaging material of choice for many narcotics; scales are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the drugs being sold; microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are often used to "cook" powder cocaine into cocaine base, or to mix and dilute heroin, and transport it discreetly thereafter.

b.      It is also common for narcotics traffickers to distribute from specific locations other than their own residences, to include stash houses, the residences of family members and associates, both witting and sometimes unwitting, and other locations where trusted associates of the trafficker are allowed access, in order to protect the cache of drugs, as well as the drug proceeds derived from the sale of these drugs.  Such locations provide security for the trafficker.  They are known locations where customers go to obtain drugs.

c.      Drug traffickers often use, carry, and retain firearms and other weapons to

protect themselves, as well as to secure their cache of narcotics and the proceeds of their drug trafficking.  Individuals who possess and store firearms in their residences, vehicles and/or stash locations, or in the residences of trusted associates, often also store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits, and ownership papers in those locations.

        d.      Narcotics traffickers may also keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase.  These records may be in written or electronic form.  Narcotics traffickers also often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, numerous business cards, photographs, address and telephone number books and papers, and other documentation relating to the transportation, ordering, sale, and distribution of controlled substances, and contact information for associates and coconspirators in the narcotics trade.  This documentary evidence may include credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.  These items are generally maintained and retained for long periods of time in the drug traffickers' residences or the residences of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated. It also is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to, iPods and external storage drives; and the media to store

information, including diskettes, tapes or data storage devices.

      e.    Individuals involved in narcotics trafficking often conceal within their residences, the residences of family members, friends and associates, the places of operation of the drug distribution activity such as stash houses or safe houses, or in business locations with which the traffickers are associated, large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes.  Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative or associate, in an effort to safeguard, and more importantly conceal, such proceeds of their drug trafficking.

## **BACKGROUND**

      9.    The United States, including the Drug Enforcement Administration, is conducting a criminal investigation of Mark ANDERSON (hereinafter, "ANDERSON"), Fredrick SUTHERLAND (hereinafter, "SUTHERLAND"), HAMILTON, and others regarding possible violations of 21 U.S.C. §§ 841 and 846 (distribution of, and conspiracy to distribute, controlled substances).

      10.    In August 2019, DEA Annandale agents arrested Co-Conspirator-1 ("CC-1") in Prince George's County, Maryland as a result of a federal wiretap investigation.  CC-1 was charged in the United States District Court for the Eastern District of Virginia for conspiracy to distribute five kilograms or more of cocaine and remains incarcerated pending trial.  Based on a review of seized cell phones associated with CC-1 and other investigative means, agents identified

Co-Conspirator-2 ("CC-2"), as CC-1's Washington, D.C. metropolitan area based source of supply.

11.     In February 2020, as a result of a six-month investigation, CC-2 was arrested in Loudoun County, Virginia, after approximately 25 kilograms of cocaine were seized from his/her vehicle.  The cocaine was located inside two cardboard boxes.  The cardboard boxes were approximately 18 inches by 18 inches by 24 inches, had no markings, and were sealed with clear tape.  A search warrant executed at residences associated with CC-2 in Prince George's County, Maryland yielded approximately $1,044,000 in U.S. currency ("USC"), quantities of narcotics to include a kilogram of fentanyl, and a firearm.  CC-2 was charged and pleaded guilty in the United States District Court for the Eastern District of Virginia to conspiracy to distribute five kilograms or more of cocaine and remains incarcerated pending sentencing.

12.     As a result of various investigative means, agents learned CC-2's source of supply for the aforementioned narcotics was a Los Angeles area based individual.  In June 2020, based on a criminal complaint filed in the United States District Court for the Eastern District of Virginia, CC-2's source of supply was arrested in the Los Angeles area.  This individual agreed to cooperate with DEA Annandale agents and will hereinafter be referred to as the cooperating defendant ("CD").  CD indicated that, in addition to supplying CC-2 with narcotics, CD also supplied narcotics, including cocaine, fentanyl, heroin, and methamphetamine, to ANDERSON, who is Jamaican, or of Jamaican descent, and resides in the Los Angeles area.  CD indicated ANDERSON owns tractor-trailers, or has access to a group of Jamaican tractor-trailer drivers, who transport the narcotics and narcotics proceeds between California and locations along the east coast and in the Midwest.  CD indicated she/he, as well as ANDERSON, had associates in these regions, to include

Ohio, New York, Missouri, and the Baltimore-Washington area, who would receive and distribute the narcotics shipments and collect the narcotics proceeds.  DEA Annandale subsequently learned that ANDERSON was the subject of a DEA Dayton (OH) investigation in which ANDERSON was identified as one of the sources of supply for a narcotics shipment seized in early November 2019 consisting of multiple kilograms of cocaine and fentanyl.  CD indicated she/he had supplied ANDERSON with this narcotics shipment, which was transported via tractor-trailer.  Furthermore, CD indicated she/he was informed of the law enforcement seizure of the narcotics by ANDERSON.

13.    In August 2020, CD provided DEA Annandale agents with the cell phone number (424) 434-9464 (hereinafter, the "Sutherland Phone") for a California-based tractor-trailer driver involved in the transportation of narcotics and narcotics proceeds on behalf of ANDERSON.  On September 17, 2020, the Honorable John F. Anderson, U.S. Magistrate Judge for the Eastern District of Virginia, authorized the disclosure of location based services, commonly known as a "ping," on the Sutherland Phone for thirty days.

14.    On September 18, 2020, the ping on the Sutherland Phone was activated and through physical surveillance associated with the location of the Sutherland Phone, agents were able to identify the user as SUTHERLAND as well as the tractor trailer associated with SUTHERLAND.  A review of law enforcement and DEA indices revealed SUTHERLAND holds an active California commercial driver's license and was previously identified in a DEA Houston investigation in reference to his involvement in the transportation of a large shipment of marijuana from California to Philadelphia.

15.     On October 9, 2020, based on ping data related to the Sutherland Phone, DEA Annandale agents and other law enforcement personnel conducted physical surveillance on SUTHERLAND as he traveled via tractor-trailer through Maryland after having traveled cross-country from the Los Angeles, California area.  SUTHERLAND was observed meeting with Jason ROSE, a previously identified associate of ANDERSON, in an industrial area in Edgewood, Maryland.  Agents determined that ROSE had traveled from the Los Angeles area via commercial air to Maryland prior to meeting with SUTHERLAND.  At this Edgewood, Maryland location, SUTHERLAND transferred a bag containing narcotics to ROSE, who ultimately transferred the narcotics to two Washington, D.C. area based associates, Ola CLARK and Rico SPINNER, during two separate transactions.  A subsequent traffic stop conducted of CLARK and a search of her vehicle in Maryland yielded approximately one (1) kilogram of heroin.  Surveillance and a subsequent enforcement operation targeting SPINNER in Washington, D.C. yielded approximately 20 pounds of methamphetamine, five kilograms of fentanyl, and 20,000 pills suspected to contain fentanyl.

16.     A review of historical toll data for the Sutherland Phone revealed frequent contact with (240) 383-2288, a phone used by HAMILTON (hereinafter, the "Hamilton Phone").  A review of historical toll data for the Hamilton Phone revealed that in addition to the frequent contact with SUTHERLAND, it had contact with two phone numbers associated with ANDERSON, as well as several Washington, D.C. area phone numbers documented in DEA investigations.  One of these phone numbers is associated with Esteban GILL, who, according to DEA indices, was previously involved in the distribution of one kilogram of cocaine on a weekly basis in the Hagerstown, Maryland area.  Another Washington, D.C. area phone number is associated with an active target

of a DEA Maryland investigation into cocaine and heroin distribution.  Further toll analysis for the Hamilton Phone revealed contacts with numerous other Washington, D.C. area cell phones as well as contacts with a rental car company and dining establishments in the Los Angeles, California area.

17.     A review of the historical cell site locations for the Hamilton Phone revealed that the Hamilton Phone was in the Edgewood, Maryland area on October 9, 2020 during the same timeframe that SUTHERLAND, ROSE, SPINNER, and CLARK were observed to be in the area. Furthermore, while agents were conducting surveillance on SUTHERLAND, agents observed a black sport utility style vehicle drive to the area of where SUTHERLAND was parked.  This vehicle was observed leaving the area shortly after, and agents were unable to obtain the registration of the vehicle.  Agents are aware that HAMILTON owns a 2016 black Mercedes sport utility style vehicle bearing Maryland registration 1DR4411 and VIN # 4JGED6EB5GA010465 (**SUBJECT VEHICLE**) which is registered to HAMILTON at 180 High Park Lane Apartment 1508, Silver Spring, Maryland (**SUBJECT PREMISES**).   Through knowledge of this investigation, agents believe that the black vehicle seen on surveillance was the **SUBJECT VEHICLE**, and that HAMILTON met with SUTHERLAND at that time.  Not only is the **SUBJECT VEHICLE** registered to HAMILTON, agents have never observed HAMILTON driving any vehicle other than the **SUBJECT VEHICLE**, except once when he drove a dealership "loaner vehicle" on November 17, 2020, as described further below.

18.     On October 30, 2020, the Honorable Ivan D. Davis, United States Magistrate Judge for the Eastern District of Virginia, authorized the disclosure of location based data for the Hamilton Phone, for a period of 30 days.

19.     While monitoring the ping on the Hamilton Phone between October 30, 2020 and November 15, 2020, agents noted that it was frequently locating in the area of The Pearl apartment complex located at 180 High Park Lane Silver Spring, Maryland 20910.  On November 12, 2020, agents served an administrative subpoena on The Pearl and learned that HAMILTON was listed as the renter for apartment number 1508.  HAMILTON's listed contact phone number with The Pearl is (202) 341-4675, *i.e.* the call number assigned to the **TARGET CELLULAR DEVICE**. Furthermore, agents learned that HAMILTON registered the **SUBJECT VEHICLE** as his vehicle with the apartment complex and the **SUBJECT VEHICLE** is assigned parking space #F051 (as depicted in the photograph in Attachment A-2), inside the apartment complex's garage.  In a law enforcement database, the **SUBJECT PREMISES** is listed as a residence for HAMILTON.

20.     On November 13, 2020, CD advised law enforcement that SUTHERLAND would be leaving the Los Angeles, California area via tractor trailer and would be headed to the east coast with a load of narcotics in the coming days.  Agents monitoring the ping on the Sutherland Phone noted that on November 14, 2020, the phone traveled from California to Arizona.  Agents continued to monitor the ping data on the Sutherland Phone as the phone traveled across the United States and into Maryland on November 17, 2020.

21.     On November 16, 2020, agents monitoring the Hamilton Phone noted that it was no longer producing a cellular location, and determined that HAMILTON had discontinued use of the Hamilton Phone.  Agents are aware that narcotics traffickers frequently discontinue use of cellular phones as a way to thwart law enforcement.

22.     On November 18, 2020, agents subpoenaed AT&T for subscriber and call detail records for the **TARGET CELLULAR DEVICE** and learned the listed subscriber is "Andre

Hamilton, 651 Jefferson St NE, Washington, D.C. 20011." Agents also reviewed the call detail records and determined that the **TARGET CELLULAR DEVICE** had several phone contacts with Wells Fargo. On November 19, 2020, agents contacted Wells Fargo, who confirmed that the **TARGET CELLULAR DEVICE** was the contact number they had for HAMILTON.

23.     On November 17, 2020, in anticipation of a meeting between HAMILTON and SUTHERLAND, agents began conducting surveillance on both HAMILTON and SUTHERLAND. HAMILTON was observed exiting the **SUBJECT PREMISES** carrying a small bag and entering a Mercedes Benz GLA 250 SUV with writing on the back window that said "Mercedes Benz of Silver Spring Courtesy Vehicle" inside the parking garage. Surveillance was maintained on HAMILTON as he drove from the **SUBJECT PREMISES** to the same industrial park in Edgewood, Maryland as mentioned in paragraph 15. Surveillance was maintained on SUTHERLAND as he drove on I-70 in Breezewood, Pennsylvania to the same industrial complex location in Edgewood, Maryland mentioned above, arriving within minutes of HAMILTON. The industrial complex is located at the end of a dead-end of a road, and due to the seclusion of this location, it is not possible for law enforcement to maintain visual surveillance on anyone once they turn into the industrial complex. Agents set up surveillance around the industrial complex and observed both HAMILTON and SUTHERLAND enter the industrial complex, and observed HAMILTON exit the complex approximately two minutes after SUTHERLAND entered the complex. No other vehicles or persons were seen entering or exiting the industrial complex during the time that SUTHERLAND and HAMILTON were present.

24.     After HAMILTON pulled out of the industrial complex, he pulled into a hotel parking lot and was observed moving a large cardboard box from the backseat of his vehicle and

placing it into the trunk of his vehicle.  I believe that HAMILTON received the cardboard box from SUTHERLAND and that it contained narcotics.  Furthermore, I believe that when HAMILTON received the box from SUTHERLAND he quickly placed it into his vehicle in an effort to leave the industrial area as quickly as possible.  I further believe that HAMILTON pulled into the hotel parking lot to move the box to a more secure location inside his vehicle.

25.    Surveillance was maintained on HAMILTON as he drove back to the **SUBJECT PREMISES**.  Agents observed HAMILTON park inside the garage at **SUBJECT PREMISES** and remove the cardboard box from the trunk of his vehicle and carry it inside the **SUBJECT PREMISES**.  The cardboard box was approximately 18 inches by 18 inches by 24 inches, sealed with clear tape, and had no markings on it.  This cardboard box is almost identical to the ones that contained the kilograms of cocaine that CC-2 was in possession of at the time of his/her arrest as detailed in paragraph 11.  Based on training, experience and knowledge of this investigation I believe that the small bag HAMILTON was carrying when he was observed exiting the **SUBJECT PREMISES** contained USC which was payment for SUTHERLAND.  According to CD, each customer pays SUTHERLAND approximately $2,000 per kilogram for transporting the narcotics to their destination.

26.    On November 25, 2020, the Honorable Ivan D. Davis, United States Magistrate Judge for the United States District Court for the Eastern District of Virginia, authorized the disclosure of location based data for the **TARGET CELLULAR DEVICE** used by HAMILTON for a period of 30 days.

27.    On November 30, 2020, agents observed HAMILTON exit the **SUBJECT PREMISES** and enter the driver's seat of the **SUBJECT VEHICLE**.  Agents observed

HAMILTON drive from the **SUBJECT PREMISES** to a UPS Store in Silver Spring, Maryland. Agents were unable to observe HAMILTON enter the UPS Store.  However, HAMILTON was then observed exiting the UPS store carrying an empty cardboard box which appeared to be identical to the one seen on November 17, 2020.

28.     On December 11, 2020, the Honorable Magistrate Judge Gina L. Simms signed search warrants authorizing the search of the **SUBJECT PREMISES (GLS-20-3090)** and the **SUBJECT VEHICLE (GLS-20-3091)** as well as the use of a cell-site simulator to track the **TARGET CELLULAR DEVICE (GLS-20-3092)**.  At the time, it was anticipated that the tractor-trailer would be arriving in the District of Maryland within 14 days.

29.     On December 16, 2020, agents conducted surveillance at the **SUBJECT PREMISES** and observed the **SUBJECT VEHICLE** parked in its assigned space.  Agents monitoring the ping on the **TARGET CELLULAR DEVICE** noted it was in the area of the **SUBJECT PREMISES** during the time that surveillance was being conducted, including during the time that agents observed the **SUBJECT VEHICLE** parked at the **SUBJECT PREMISES**.

30.     On December 19, 2020 and December 20, 2020, agents monitoring the ping on the **TARGET CELLULAR DEVICE** noted that it traveled to Brooklyn, New York, via interstate highways.  After staying in Brooklyn for approximately one hour, the **TARGET CELLULAR DEVICE** began traveling south on I-95.  When the **TARGET CELLULAR DEVICE** was in the area of I-295 at the New Jersey, Delaware line, a license plate reader captured a photo of the **SUBJECT VEHICLE** as it was approaching the bridge between New Jersey and Delaware.  The ping on the **TARGET CELLULAR DEVICE** continued to travel south on I-295 before coming at the **SUBJECT PREMISES**.  Due to the **SUBJECT VEHICLE** being in the same location as

14

the **TARGET CELLULAR DEVICE**, at the same time, agents believe that HAMILTON drove the **SUBJECT VEHICLE** from the **SUBJECT PREMISES** to Brooklyn, New York. Furthermore, agents know that HAMILTON is in communication with a phone number associated with an individual who resides in Brooklyn, New York. According to DEA indices, this individual is involved in a current DEA investigation in New York regarding narcotics trafficking and money laundering. Based on training, experience and knowledge of this investigation, agents believe that HAMILTON met with this individual in New York to deliver narcotics or collect narcotics proceeds from them.

31.     On December 21, 2020, CD advised law enforcement that SUTHERLAND would be leaving the Los Angeles, California area via tractor-trailer and would be headed to the east coast with a load of narcotics in the coming days. CD further advised that SUTHERLAND had been delayed in leaving California. CD believed the delay was due to SUTHERLAND not being able to locate a legitimate "cover load" to transport.

32.     On December 21, 2020, at approximately 11:30 P.M. PST, agents monitoring the ping on the Sutherland Phone noted that it left the Los Angeles, California area and began traveling east on I-15. Based on previous monitoring's of the Sutherland Phone, this is consistent with the route SUTHERLAND has traveled when driving from California to the east coast. Based on my knowledge of the amount of time it has taken SUTHERLAND to drive the tractor-trailer across the country on previous trips associated with this case, I believe it is likely that SUTHERLAND will arrive in the District of Maryland in approximately four or five days.

33.     During the time period that law enforcement has been monitoring the pings on the Hamilton Phone and the **TARGET CELLULAR DEVICE**, and to be best of my knowledge,

there are no other residences at which HAMILTON had stayed overnight other than the **SUBJECT PREMISES**.  Additionally, agents have not seen anyone coming or going from the **SUBJECT PREMISES** that are believed to reside at the **SUBJECT PREMISES**.

34.    Due to the lack of precise location-based information of the **TARGET CELLULAR DEVICE**, as well as the time lag between "pings" (approximately 15 minutes), law enforcement is seeking authorization to utilize a cell-site simulator to assist in locating the **TARGET CELLULAR DEVICE**.  The cell-site simulator would be deployed during the time-frame leading up to, during, and following another anticipated transfer of narcotics from SUTHERLAND to HAMILTON.  Based upon information received from CD, law enforcement anticipates that sometime in the next fourteen days, SUTHERLAND will travel via tractor-trailer from California with a load of narcotics to the east coast.  Based upon their knowledge of this investigation, and the time that has elapsed since the last known transaction involving HAMILTON, agents believe that SUTHERLAND will conduct a narcotics transaction with HAMILTON.  Agents believe the transaction will occur late in the evening either in the industrial area in Edgewood, Maryland, described in paragraphs 15 and 23, or in a similarly secluded location off of Interstate 95.  Law enforcement anticipates the interdiction of narcotics, the identification of conspirators, and eventual arrests based on the utilization of the cell-site simulator.  Because agents have not observed HAMILTON operating any vehicle other than the **SUBJECT VEHICLE** and the car dealership "loaner vehicle" on November 17, 2020, I believe there is probable cause that the **SUBJECT VEHICLE** will be used to meet SUTHERLAND, retrieve the narcotics shipment, and transport it to the **SUBJECT PREMISES**.

35.     It is currently unknown precisely at what hour of the day or night the tractor-trailer containing the controlled substances will arrive and when HAMILTON will receive the controlled substances.  Based on previous monitoring of the ping on the Sutherland Phone, agents know that SUTHERLAND typically travels during the evening to overnight hours.  Additionally, the events that occurred on October 9, 2020, as described in paragraph 15, occurred between the hours of 11:30 P.M. and 3:00 A.M.  For officer safety and the prevention of the destruction of evidence, the execution of this warrant should be carried out while HAMILTON is out of the residence retrieving the controlled substances from SUTHERLAND.  Because the exact timing is unknown, it is possible that this could take place during the night and therefore I request authorization to execute this warrant at any time during the day or night.

## MANNER OF EXECUTION REGARDING CELL-SITE SIMULATOR

36.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.  When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication.  These signals include a cellular device's unique identifiers.

37.     To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the **TARGET CELLULAR DEVICE** or receiving signals from nearby cellular devices, including the **TARGET CELLULAR DEVICE**.  Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others.  The device may send a signal to the **TARGET CELLULAR DEVICE**

and thereby prompt it to send signals that include the unique identifier of the device.  Law enforcement may monitor the signals broadcast by the **TARGET CELLULAR DEVICE** and use that information to determine the **TARGET CELLULAR DEVICE**'s location, even if it is located inside a house, apartment, or other building.

38.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity.  Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices.  In order to connect with the **TARGET CELLULAR DEVICE**, the device may briefly exchange signals with all phones or other cellular devices in its vicinity.  These signals may include cell phone identifiers.  The device will not complete a connection with cellular devices determined not to be the **TARGET CELLULAR DEVICE**, and law enforcement will limit collection of information from devices other than the **TARGET CELLULAR DEVICE**.  To the extent that any information from a cellular device other than the **TARGET CELLULAR DEVICE** is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the **TARGET CELLULAR DEVICE** from all other cellular devices.

## USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG TRAFFICKERS

39.     Based on my training, experience, and participation in narcotic and drug-related investigations, and my knowledge of this case, I know that:

a.     It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages)

and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

b.       Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

c.       Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations.  It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

d.       Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

40.       In my training and experience, it is likely that the **SUBJECT PREMISES** and the **SUBJECT VEHICLE** will contain at least one cellular phone because of the use of cellular phones in furtherance of the conspiracy to distribute controlled substances described above.

41.       Further, I know that HAMILTON has used cellular phones to communicate about drug transactions with SUTHERLAND and other individuals involved in drug distribution.

42.       After any cellular phones are seized, DEA will begin the search of the phones within the Eastern District of Virginia.  If DEA cannot complete the search then agents will send the phones to a private company that specializes in data extraction from Apple iPhones and other electronics.  This private company will either (a) unlock the phone(s) and then return the phone(s)

to law enforcement and law enforcement will then conduct the actual analysis of the contents of the phone(s) or (b) unlock the phone(s) and create a forensic image of the phone(s), and then return the phone(s) to law enforcement and law enforcement will then conduct the actual analysis of the contents of the phone(s).

## TECHNICAL TERMS

43.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     *IP Address*:  The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.     *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.     *Storage medium*: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

44.    As described above and in Attachment B-1, this application seeks permission to search for records that might be found in the **SUBJECT PREMISES** and the **SUBJECT VEHICLE** in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

45.    *Probable cause*.  I submit that if a computer or storage medium is found in the **SUBJECT PREMISES** or the **SUBJECT VEHICLE**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in

particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

46.     *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** and the **SUBJECT VEHICLE** because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the

times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

   b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence

relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

        d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer

behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

47.      *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or

months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the **SUBJECT PREMISES** and the **SUBJECT VEHICLE**.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

48.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## AUTHORIZATION REQUEST

49.     Based on the information provided in this affidavit, probable cause exists to believe that Andre HAMILTON is involved in a conspiracy to distribute controlled substances in violation

of Title 21, United States Code, Sections 841(a)(1) and 846.  There is also probable cause to believe

that items and records, which are evidence of violations of Title 21, United States Code, Sections

841(a)(1) and 846 are currently contained in the **SUBJECT PREMISES** and the **SUBJECT**

**VEHICLE**.  The items and records to be seized are more particularly described in Attachment

B-1.  Wherefore, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I respectfully

request warrants to search and authority to seize at the **SUBJECT PREMISES** and the **SUBJECT**

**VEHICLE** those items identified in Attachment B-1.  I further request that the Court authorize

execution of the warrants at any time of day or night, for the reasons described previously

regarding the likelihood of the arrival of the narcotics shipment outside of daytime hours.

      50.      Regarding the **TARGET CELLULAR DEVICE**, I request that the Court issue the

proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.  The proposed

warrant also will function as a pen register order under 18 U.S.C. § 3123.

      51.      I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days from the end of the period of authorized surveillance.  This delay is justified because there

is reasonable cause to believe that providing immediate notification of the warrant may have an

adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or

user of the **TARGET CELLULAR DEVICE** would seriously jeopardize the ongoing

investigation, as such a disclosure would give that person an opportunity to destroy evidence,

change patterns of behavior, notify confederates, and continue to flee from prosecution.  *See* 18

U.S.C. § 3103a(b)(1).  There is reasonable necessity for the use of the technique described above,

for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

52.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET CELLULAR DEVICE** outside of daytime hours.

53.     A search warrant may not be legally necessary to compel the investigative technique described herein regarding the **TARGET CELLULAR DEVICE**.  Nevertheless, I hereby submit this warrant application out of an abundance of caution.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Jenna Sullivan
Task Force Officer
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 23re̶t̶h̶ day of December, 2020.

Charles B. Day
Digitally signed by Charles B. Day
DN: cn=Charles B. Day, o=US District Court of MD,
ou=USDC,
email=mdd_cbdchambers@mdd.uscourts.gov, c=US
Date: 2020.12.23 14:36:40 -05'00'

The Honorable Charles B. Day
United States Magistrate Judge
District of Maryland

20-mj-3226-CBD

**ATTACHMENT A-1**

**PROPERTY TO BE SEARCHED**
**SUBJECT PREMISES**

The property to be searched is located at 180 High Park Lane Apartment 1508, Silver Spring, Maryland 20910 and any electronic devices (e.g. computers and/or cellphones) located therein.  The residence is located inside The Pearl apartment building, which is a high rise apartment building with entry to the building permitted through key card access only.  The apartment building has a mix of light and dark colored siding.  The lobby of the building is on the first floor with the numbers "180" affixed to the left of the glass entryway doors.  Apartment 1508 is located on the 15th floor and the number "1508" are affixed to the right of the apartment door in a lighted enclosure.  The apartment door is dark gray in color with a chrome door handle and is depicted in the photograph below.



20-mj-3227-CBD

## **ATTACHMENT A-2**

### **PROPERTY TO BE SEARCHED**
### **SUBJECT VEHICLE**

The property to be searched is:

A black 2016 Mercedes black sport utility style bearing Maryland registration 1DR4411 and VIN# 4JGED6EB5GA010465 registered to Andre HAMILTON which is depicted in the photograph below.



## ATTACHMENT A-3

This warrant authorizes the use of the electronic investigative technique described in Attachment B-2 to identify the location of the cellular device assigned phone number **(202)341-4675** (the TARGET CELLULAR DEVICE), with International Mobile Subscriber Identifier **310410936243056**, whose wireless provider is AT&T, and whose listed subscriber is "Andre Hamilton, 651 Jefferson St NE, Washington, D.C. 20011."

20-mj-3226-CBD

20-mj-3227-CBD

## **ATTACHMENT B-1**

## **LIST OF ITEMS TO BE SEIZED AND SEARCHED**

The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offense, in violation of 21 U.S.C. § 846, (collectively, the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to:

1.     Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

2.     Items used in the manufacture or cooking of methamphetamine or other controlled substances including precursor chemicals, chemistry guides, glassware and flasks, which is evidence of the TARGET OFFENSES.

3.     Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchased of same, and related firearm paraphernalia, which constitute tools for the commission of the TARGET OFFENSES.

4.     Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

5.     Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

6.     Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

7.     Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES.

8.     United States currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds of the TARGET OFFENSES.

9.     Photographs, in particular photographs of coconspirators, assets, firearms, and controlled substances, which constitute evidence of the TARGET OFFENSES.

10.    Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES.

12.    Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES.

13.    Cellular telephones, cameras, computers, laptops, iPads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

14.    Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses. The following definitions apply to the terms as set out in this affidavit and attachment:

a.     Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b.     Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c.     Documentation: Computer-related documentation consists of written,

33

recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

        d.     Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data.  Data security devices may consist of hardware, software or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touches.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

        As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored.  This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms.  It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

    15.    For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

        a.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b.     evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        c.     evidence of the lack of such malicious software;

        d.     evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

        e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

        f.     evidence of the times the COMPUTER was used;

        g.     passwords, encryption keys, and other access devices that may be necessary

to access the COMPUTER;

       h.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

       i.    contextual information necessary to understand the evidence described in this attachment.

     16.    With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

       a.    surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

       b.    "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

       c.    "scanning" storage areas to discover and possible recover recently deleted files;

       d.    "scanning" storage areas for deliberately hidden files; or

       a.    performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

     15.    If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

     16.    With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the

attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.

**This warrant authorizes the <u>seizure</u> of any COMPUTER or electronic device. However, with respect to any COMPUTER or electronic device, this warrant authorizes only the <u>search</u> of any COMPUTER or electronic device that is reasonably determined to have been owned or utilized by HAMILTON.**

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

20-mj-3228-CBD

## <u>ATTACHMENT B-2</u>

Pursuant to an investigation of Andre HAMILTON for violations of 21 U.S.C. §§ 841(a)(1) and 846, this warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A-3 by collecting and examining:

1.     radio signals emitted by the TARGET CELLULAR DEVICE for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2.     radio signals emitted by the TARGET CELLULAR DEVICE in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night.  This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property.  The Court finds reasonable necessity for the use of the technique authorized above.  *See* 18 U.S.C. § 3103a(b)(2).